In the Matter of THOMAS P. LA PENNA et al., Respondents, *v.* UNION FREE SCHOOL DISTRICT No. 9, TOWN OF CHEEKTOWAGA, et al., Appellants.

Fourth Department, February 20, 1964.

*Lester C. Goodchild (Rudolph U. Johnson* of counsel), for respondents.

*Thaddeus J. Piusienski (John B. Walsh* of counsel), for appellants.

Bastow, J.   The School District and Board of Education appeal from an order in an article 78 proceeding granting monetary relief to petitioners who in the school year 1961–1962 were employed as teachers by appellants.

Prior to the commencement of that school year the Board of Education adopted a minimum salary schedule as mandated by the then applicable statute (Education Law, §§ 3102, 3103; L. 1961, ch. 813).   Briefly stated, such salary schedules were controlled by two factors — first, years of service and second, extent of educational preparation of the individual teacher. The latter classification consisted of three groups — first, those holding a baccalaureate degree, second, those who had completed a fifth year of preparation and third, those who had completed a sixth year of preparation.

The then applicable statute mandated the board to fix a minimum salary for those holding a baccalaureate degree and in their first year of service of " at least $4200 with at least ten annual increments of not less than $200." In other words, such a teacher in the first year of service was required to receive a minimum of $4,200; at least $5,000 in the fifth year of service and $6,200 in the eleventh year of service.   The differential among each of the three groups based upon educational preparation was mandated at the sum of at least $300 with similar annual increments of $200 for each year of service.

The appellant board in September, 1961 adopted a minimum salary schedule in precise compliance with the statute and filed the same with the State Education Department as further required by statute. (Education Law, § 3102, subd. 5; L. 1961, ch. 813.) The present controversy arose by reason of the fact that the board was financially able to pay additional moneys to some but not to all teachers. In the words of the president of the board " the school district is financially able this year and is paying additional monies to the teachers in the first four years of teaching by way of cost of living adjustments. * * * The adjustments are necessary in order to attract qualified people and to pay them a sum sufficient for them to live on in this metropolitan area. The monies are supplemental to and in addition to the salaries set forth in the salary schedule."

Specifically, the board fixed minimum salaries for those in their first year of service (in each of the three educational groups) at a sum $400 in excess of the statutory minimum. These increases were graduated downward at the rate of $100 annually for each increasing year of service so that those in their second, third and fourth years of service (in each educational group) received amounts above the statutory minimums of $300, $200 and $100 respectively.

The petitioners are all in the fifth year of preparation and, with a single exception, in 1961 had years of service ranging from 5 to 10. Special Term decided that section 3103 of the Education Law mandated that not only must each schedule contain 10 annual increments of at least $200 each but that such formula must be precisely followed throughout. In other words, it was concluded that the board had no discretionary power to deviate therefrom as to any group of teachers but must adopt a rigid schedule applicable alike to each teacher based solely upon years of service and educational qualifications. In our opinion this overlooked the historical background of the statutory enactments relating to minimum salaries of teachers, the applicable provisions of other sections of the Education Law and the discretionary power vested in local boards of education that the Legislature has never invaded or sought to curtail.

The first enactment establishing a basic minimum salary schedule for the entire State was chapter 778 of the Laws of 1947. In approving this law the then Governor wrote that " This schedule establishes only the minimum salaries to be paid. It does not prevent a school district from paying salaries

in excess of those which it requires." (Public Papers of Governor Dewey, 1947, p. 337.) In October, 1950 Governor Dewey appointed a committee headed by then Lieutenant Governor Moore to study a new proposed State-wide salary increase for teachers. The committee in March, 1951 submitted an exhaustive report (Public Papers of Governor Dewey, 1951, pp. 126–166). Significant to the problem before us is the following statement of the Moore Committee (p. 131): "State schedules of salaries for teachers are not, and should not be, designed to prescribe actual salaries to be paid by individual school districts. They should be regarded as minimums directed toward requiring localities which otherwise might not do so, to pay enough to obtain good teachers. Responsibility for teacher salary policy and for setting actual salaries for teachers, in the view of the Committee, is primarily local. Localities should establish schedules of actual salaries for their teachers by making upward adjustments, in their discretion, for factors such as: 1. Varying responsibilities for different positions; 2. Differences in qualifications; 3. Further recognition of years of experience either within or without the system; 4. Differences in local standards of living; and 5. Recognition of exceptional service."

This view was implemented in a declaration of public policy in the same year when the minimum salary schedules were revised. (L. 1951, ch. 756.) Section 1 thereof stated that "It has been the declared public policy of the state of New York to require all school districts to pay to each teacher in the public schools a salary not less than a minimum amount at which he can maintain himself, with an appropriate allowance for years of service, educational qualifications, and quality of teaching ability. * * * Many school districts should and do pay salaries in excess of such minimums."

Section 3102 of the Education Law contains the basic requirements for the minimum salary schedules set forth in section 3103. Subdivision 3 of section 3102 specifically authorizes school authorities to "adopt schedules providing for higher rates of pay than are required by the provisions of this article, through higher salaries and more frequent, larger or additional increments, provided, however, that no salary differential among members of the teaching and supervising staff shall be established on the basis of sex."

For more than 45 years the Legislature has mandated boards of education in cities to adopt by-laws fixing uniform salary

schedules of teachers at amounts not less than those prescribed in the statute. (L. 1919, ch. 645 which added art. 33-B to the Education Law.) It has been consistently held that such schedules mandated by the Legislature are the minimum salaries that may be paid. Thus, in *Matter of Putnam* v. *Marshall* (286 N. Y. 485, 490), it was said that " The provisions of section 889 are clear, unambiguous and mandatory. Little room, if any, is left for construction or for discretion in their application. The Legislature, which has conferred upon the Board of Education power to determine the salary and compensation of all employees, has placed a rigid restriction upon its exercise. The salaries of positions as fixed in 1931 may not be reduced." See, also, *Harman* v. *Board of Educ. of City of N. Y.* (300 N. Y. 21, 29). But our attention has been directed to no authority holding that these enactments have deprived, or were intended to deprive, school authorities of local autonomy to pay higher salaries to individual teachers or selected groups of teachers. The historical background of the legislation, heretofore recited, furnishes convincing proof that the Legislature had no such intention.

We construe the pertinent statutory provisions to require that a board of education must adopt a schedule fixing the minimum salaries mandated by section 3103, including an automatic annual increment of at least $200 for at least 10 years of service and a further differential of $300 per annum among three groups viz.: (1) those teachers with a baccalaureate degree; (2) those who have completed a fifth year of preparation and (3) those who have completed a sixth year of preparation.

These mandated schedules establish *minimum* salaries which must be paid and a board may not fix salaries below these specified levels. But they are not intended as actual salary schedules fitting the requirements of every locality. Each community may devise schedules to meet its special local conditions so long as salaries are not reduced below the applicable State minimum. (Cf. *Rosen* v. *New York City Teachers' Retirement Bd.*, 282 App. Div. 216, 217, 218, affd. 306 N. Y. 625.) The sole statutory prohibition against discrimination is that found in subdivision 3 of section 3102 forbidding the establishment of salary differentials based on sex.

Herein, the board adopted a schedule that fully complied with the statute and in no manner discriminated among those in any class or group set forth in the schedule. The board then found itself with some additional funds. It decided to use the

moneys in an attempt to attract new teachers. It adopted a revised schedule applicable to those in the first four years of teaching in all three educational groups. The cost of living adjustments were graduated from $400 to $100 annually with the larger amounts going to those in the first or second year of service. We conclude that this was the right of the board and petitioners, who are concededly receiving the statutory minimum salaries for their respective groups and years of service, have no legal ground for action.

A similar conclusion was reached in *Matter of Mandeville* (1 Ed. Dept. Rep. 599), where a teacher was denied an automatic increase upon completing an additional year of service upon a determination that her services were not entirely satisfactory although not of a nature to warrant discharge under the Tenure Law. The Acting Commissioner of Education in dismissing the appeal wrote (pp. 600–601) that " The statutory provisions in respect to salary schedules and the payment of teachers thereunder are in derogation of the common-law right of a board of education to fix the salary of any of its employees. This being so, there must be a certain degree of strict construction attached to the statutory mandates. After a board of education has clearly complied with the minimum requirements of the statute, both as to amounts of salary and amounts and number of increments, it has always been the view of myself and my predecessors in office that it can set forth such amounts of salary, and number and conditions of granting of increments as it pleases. For instance, a board is required to have ten salary steps. It could elect to have eleven, or twelve, or thirteen, or fourteen. It can determine the amounts of the increments of the steps above ten. It can determine the conditions under which it grants such latter increments. It can single out one teacher and grant her increases under conditions which do not necessarily have to pertain to other teachers. This is its common-law right which has not been taken away from it by legislative fiat.''

Special Term correctly stated that the amended schedule fixing the increased salaries for those teachers in their first to fourth years of service was not filed with the Commissioner of Education. This was a ministerial act and the command of the statute (Education Law, § 3102, subd. 5) was merely directory. The inadvertent failure to comply was not fatal. (*Harman* v. *Board of Educ. of City of N. Y.*, 300 N. Y. 21, 30, *supra*.)

The order should be reversed and the petition dismissed, without costs.

WILLIAMS, P. J., HENRY, NOONAN and DEL VECCHIO, JJ., concur.

Order unanimously reversed, without costs of this appeal to any party and petition dismissed.