OPINION OF THE COURT
Kenneth R. Fisher, J.
In this CPLR article 78 proceeding, petitioner, Lee T. Countryman, seeks annulment of Local Laws, 1997, No. 2 of the Town of Rush, adopted by respondent Rush Town Board on April 9, 1997. Petitioner contends that respondents, in adopting Local Law No. 2, failed to comply with the notice requirements of the Town Law and the Municipal Home Rule Law, that the law results in an unconstitutional taking of his property, and that the law violates his rights to equal protection of law, as guaranteed by the State and Federal Constitutions. For the reasons that follow, the court converts the CPLR article 78 proceeding to a declaratory judgment action (see, CPLR 103 [c]; Matter of Lee v La Brake, 222 AD2d 1050, 1051 [4th Dept 1995]; Matter of Committee to Preserve Character of Skaneateles v Major, 187 AD2d 940 [4th Dept 1992]; Bakery Salvage Corp. v City of Buffalo, 175 AD2d 608, 609 [4th Dept 1991]), and declares Local Law No. 2 unconstitutional.
FACTS
The facts are generally undisputed. On August 14, 1996, several months after Congress enacted the Telecommunications Act of 1996 (47 USC § 332 [c] [7] [A]), the Rush Town Board imposed a six-month moratorium on the erection of telecommunication towers within the town. During that moratorium period, the Town Board, after consulting with the Planning and Zoning Boards, drafted Local Laws, 1997, No. 1 of the Town of Rush, entitled “Telecommunication Towers”, which provides that no communication tower shall be erected unless a special use permit is issued by the Planning Board.
The stated purpose of Local Law No. 1, which sets forth conditions upon which the Planning Board may issue special *738 use permits, is “to promote the health, safety and general welfare of the residents of the Town of Rush, to provide standards for the safe provision of telecommunications consistent with applicable Federal and State regulations, and to protect the natural features and aesthetic character of the Town of Rush with special attention to open space, vistas, farm land, and wooded areas.”
Shortly after Local Law No. 1 was enacted, a second law (Local Law No. 2) was proposed to modify the provisions of the Town Code relating to the issuance of special use permits for telecommunication towers. Specifically, Local Law No. 2 modified subdivision (D) of section 99-29A, entitled Special Use Permit Regulations, to include the following provisions:
“2. Location
“Applicants for telecommunication towers shall locate, erect and site said towers in accordance with the following priorities (One (1) being the highest priority and six (6) being the lowest priority):
“1. on existing towers or structures;
“2. on Town of Rush properties;
“3. on Rush Fire Department properties;
“4. in limited industrial districts;
“5. in commercial districts;
“6. in residential districts.
“Upon filing an application for a permit for a tower, the applicant shall submit a report demonstrating the applicant’s review of the above locations in order of priority demonstrating technologically the reason for the site selection. If the site selection is not highest priority, then an explanation as to why sites of a higher priority were not selected should be included with the application.
“Notwithstanding the above, the Planning Board may approve any site located within an area in the above list of priority areas if the alternate site provides reasonable services and meets the minimum needs of the service provider and the Board, in writing, finds it is in the best interest of the service provider and health, safety and welfare of the Town of Rush.
“The applicant shall, in writing, identify and disclose the number of locations of any additional sites that the applicant is or will be considering, reviewing, or planning for telecommunication towers in the Town of Rush, and all towns adjacent to Rush, for a two year period from the date of this application.”
*739 Petitioner commenced this proceeding on August 29, 1997, alleging that Local Laws No. 1 and No. 2 were adopted in violation of lawful procedure and that Local Law No. 2 is unconstitutional. In opposition to the petition, respondents submitted an answer, verified by respondent Schmitt, an affidavit from respondent Schmitt, an affidavit from the Deputy Town Clerk, minutes of all the relevant public hearings and Town Board meetings, and copies ¡of the legal notices published with respect to the challenged laws) Both sides have submitted a memorandum of law.
DISCUSSION
I. Statutory Notice Issues
Portion of opinion rejecting statutory claims deleted for publication.
II. Constitutional Issues
Petitioner challenges the constitutionality of Local Law No. 2, which prioritizes locations for telecommunication towers in the Town of Rush. Lowest on the priority list are locations in residential districts, where petitioner’s property is situated. Petitioner contends that Local Law No. 2 results in an unconstitutional taking of his property and deprives him of equal protection of law. “A landowner who claims that land regulation has effected a taking of his property bears the heavy burden of overcoming the presumption of constitutionality that attaches to the regulation and of proving every element of his claim beyond a reasonable doubt”, (de St. Aubin v Flacke, 68 NY2d 66, 76 [1986]; see, Northern Westchester Professional Park Assocs. v Town of Bedford, 60 NY2d 492, 500 [1983].)
In the context of a newly enacted restriction,[1] three scenarios are posited in the case law, the first two of which are per se rules. There are “two discrete categories of regulatory action * * * [that are] compensable without case-specific inquiry into the public interest advanced in support of the restraint.” (Lucas v South Carolina Coastal Council, 505 US 1003, 1015 [1992].) “The first encompasses regulations that compel the property owner to suffer a physical ‘invasion’ of his property *740 * * * no matter how minute the intrusion, and no matter how weighty the public purpose behind it”. (Supra; see, Matter of Gazza v New York State Dept. of Envtl. Conservation, 89 NY2d 603, 616 [1997].) Petitioner does not make a claim of this sort. “The second situation in which we have found categorical treatment appropriate is where regulation denies all economically beneficial or productive use of land.” (Lucas v South Carolina Coastal Council, supra, 505 US, at 1015; see, Matter of Gazza v New York State Dept. of Envtl. Conservation, 89 NY2d, at 616-617.) Otherwise, when a regulation deprives a landowner only of some economically beneficial or productive use of his land, “the Fifth Amendment is violated when land-use regulation ‘does not substantially advance legitimate state interests’ ”, (Lucas v South Carolina Coastal Council, supra, 505 US, at 1016, quoting Agins v City of Tiburon, 447 US 255, 260 [1980]; see, Matter of Gazza v New York State Dept. of Envtl. Conservation, 89 NY2d, at 616; Federal Home Loan Mtge. Corp. v New York State Div. of Hous. & Community Renewal, 87 NY2d 325, 335 [1995]; Manocherian v Lenox Hill Hosp., 84 NY2d 385, 392 [1994]; Seawall Assocs. v City of New York, 74 NY2d 92, 107, n 6 [1989], cert denied sub nom. Coalition for Homeless v Seawall Assocs., 493 US 976 [1989].) A determination whether this third manner of taking has occurred must be fact specific, and requires a balancing of “ ‘[t]he economic impact of the regulation on the claimant and * * * the extent to which the regulation has interfered with distinct investment-backed expectations’ ” or other impairment of “noneconomic interests in land” against the public interests advanced by the State in support of the regulation. (Lucas v South Carolina Coastal Council, supra, 505 US, at 1019-1020, n 8, quoting Penn Cent. Transp. Co. v New York City, 438 US 104, 124 [1978]; see, Matter of Gazza v New York State Dept. of Envtl. Conservation, 89 NY2d, at 617-618; Rochester Gas & Elec. Corp. v Public Serv. Commn., 71 NY2d 313, 324 [1988].)
Petitioner’s claim must be considered under the second and third scenarios posited above. Petitioner wholly fails, however, to satisfy his burden to show questions of fact concerning whether he has lost all beneficial use of his land, i.e., “that the subject property cannot yield an economically reasonable return as zoned”. (Matter of Loujean Props. v Town Bd., 160 AD2d 797 [2d Dept 1990]; see, Matter of National Merritt v Weist, 41 NY2d 438, 445 [1977]; Shukovsky v Clavin, 163 AD2d 919 [4th Dept 1990].) “The mere fact that [he] might be able to obtain a higher return on [his] property] if [it] w[as] zoned *741 [differently] is insufficient”. (Clearwater Holding v Town of Hempstead, 237 AD2d 400, 401 [2d Dept 1997].) Petitioner offers no proof regarding the value of his residential property before and after the adoption of Local Law No. 2. (Tilles Inv. Co. v Town of Huntington, 137 AD2d 118, 122 [2d Dept 1988] [“In order to make the necessary showing, a landowner must offer proof of the market value of the property at the time of acquisition, and proof of the current value of the property as presently zoned”], affd on other grounds 74 NY2d 885 [1989]; Raskin v Town of Islip, 185 AD2d 923, 925 [2d Dept 1992] [need for “‘dollars and cents’ proof’]; cf., Kim v City of New York, 90 NY2d, supra, at 26, n 8 [Smith, J., dissenting] [“conclusory assertion that the property is ‘worthless to them’ is clearly insufficient”].)
Nor does petitioner establish that, under the Penn Cent. balancing test required in cases of only diminution in use, he is entitled to relief. Because of the nature of Local Law No. 2 as prohibiting petitioner’s freedom to lease his property to a third party for the purpose of constructing a tower, petitioner is really claiming that form of taking analogized to the tort of “interference with prospective advantage.” (Epstein, Takings: Private Property and the Power of Eminent Domain, at 74 [1985].) It is the least favored form of “taking” recognized by the courts. (Id., at 75 [“the judicial response to the right of disposition is marked by a general hostility, tempered only by occasional protection”].) In this case, the claim is weaker still, for the interference claimed to constitute a taking by petitioner is not an existing lease or contract,[2] but only the opportunity to bid on the contract offered by the telecommunications company. There is no guarantee that petitioner will procure the lease or contract; he only wishes the opportunity taken away by the government to convince the carrier that the latter’s interests lie with him, not another landowner, including the Town.
Unlike the typical case, this is indeed “a case where the petitioner is seeking compensation for lost opportunities”. (Almota Farmers El. & Warehouse Co. v United States, 409 US 470, 476, n 3 [1973].) Such cases pose the “question * * * of *742 creating a legally cognizable value where none existed, or of compensating a mere incorporeal expectation.” (Supra, 409 US, at 476.) Despite eloquent arguments for a contrary holding (Epstein, op. cit, at 78-80, 88-92),[3] current takings jurisprudence does not recognize the interest asserted by the petitioner here. As in other regulatory takings contexts, “[c]aselaw has run in the other direction * * * and it is not for a lower court to reverse this tide.” (Federal Home Loan Mtge. Corp. v New York State Div. of Hous. & Community Renewal, 83 F3d 45, 49 [2d Cir 1996].) “Frustration and appropriation are essentially different things.” (Omnia Co. v United States, 261 US 502, 513 [1923], quoted in Matter of City of New York [Friedman], 24 AD2d 243, 244 [1st Dept 1965].) “The Supreme Court has held that the disruption of private expectations does not constitute a taking.’ ” (LB Credit Corp. v Resolution Trust Corp., 49 F2d 1263, 1265 [7th Cir 1995].) In short, the Town of Rush, by means of Local Law No. 2, “did not appropriate any business, contract, land, or property of [petitioner].” (United States v Grand Riv. Dam Auth., 363 US 229, 236 [1960].) For this reason, there is no need to undertake the Penn Cent, balancing, and, one might suppose, because this is a holding that the “property” interest asserted by petitioner is not cognizable “property” within the meaning of the Takings Clause, no need to determine whether the local law rationally relates to a valid governmental purpose.
But Lucas (505 US, supra, at 1016) and the New York Court of Appeals emphasize that “[a]ny takings analysis involves the resolution of whether the government legislation is ‘supported by a substantial State interest and close nexus’ ”. (Matter of Gazza v New York State Dept. of Envtl. Conservation, 89 NY2d, supra, at 616 [emphasis supplied], quoting Manocherian v Lenox Hill Hosp., 84 NY2d, supra, at 399; see also, Federal Home Loan Mtge. Corp. v New York State Div. of Hous. & Community Renewal, 87 NY2d, supra, at 335.) In any event, the petition is directed specifically to the issue of substantial governmental interest and nexus, and therefore it states, without specifically delineating, a due process claim. (Rovello v Orofino Realty Co., 40 NY2d 633, 635-636 [1976].) Additionally, determination of this question is made necessary by the presentation of petitioner’s equal protection claim, as set forth below. Accordingly, for these three independent reasons, the *743 court must reach the issue whether Local Law No. 2 is a valid exercise of the Town’s zoning power.
“In order for a zoning ordinance to be a valid exercise of the police power it must survive a two-part test: (1) it must have been enacted in furtherance of a legitimate governmental purpose, and (2) there must be a ‘reasonable relation between the end sought to be achieved by the regulation and the means used to achieve that end’ ”. (McMinn v Town of Oyster Bay, 66 NY2d 544, 549 [1985], quoting French Investing Co. v City of New York, 39 NY2d 587, 596 [1976].) Respondents contend that Local Law No. 2 is a valid exercise of the police power because it promotes the aesthetic character of the Town of Rush. While it is true that “aesthetics, in itself, constitutes a valid basis for the exercise of the police power” (Modjeska Sign Studios v Berle, 43 NY2d 468, 478 [1977]; see also, People v Stover, 12 NY2d 462, 466-468 [1963]; Philanz Oldsmobile v Keating, 51 AD2d 437, 440-441 [4th Dept 1976]), Local Law No. 2 is not rationally related to that purpose, at least insofar as it ranks property owned by the Town and the Fire Department higher on the priority list for telecommunication towers than property located in residential, commercial and industrial districts.
Zoning for aesthetic purposes has as its typical characteristic the restriction of “artistic nonconformity” (Suffolk Outdoor Adv. Co. v Hulse, 43 NY2d 483, 490 [1977]) from communities, areas or locations within a part of the community, or districts, which harbor the peculiar aesthetic preference the nonconforming use offends. (Matter of Cromwell v Ferrier, 19 NY2d 263, 272 [1967] [“what is involved are those esthetic considerations which bear substantially on the economic, social, and cultural Patterns of a community or district” (emphasis supplied)]; People v Stover, 12 NY2d, supra, at 467 [“ ‘neighborhood íruty ], quoting Dukeminier, Zoning for Aesthetic Objectives: A Reappraisal, 20 Law & Contemp Probls 218, 231 , [A] esthetic factors * * * rate well down in the hierarof public purposes”' (Rochester Tel. Corp. v Village of Fairport, 84 AD2d 455, 458 [4th Dept 1982] [“zoning is functionally a different from activities involving the general police power” (84 AD2d, at 458-459): compare, New York Tel. Co. v City of New *744 aries of the governmental body which passed the regulation. (Matter of Cromwell v Ferrier, 19 NY2d, at 271 [approving municipal-wide restriction instead of one applicable “in certain areas of a town but not in others”].)
Here, however, Local Law No. 2 purports to regulate on less than a municipal-wide basis and purports to save certain use districts from the blight of towers according to a hierarchy of priority. Unfortunately, it is indiscriminate with respect to placement or location (or nonplacement) of towers because the criterion chosen by the Town Board, with the possible (albeit only arguable — see, infra) exception of the first priority (placement on existing towers), relates solely to the fortuitous circumstance of ownership, without regard to geography, location, district, or other traditional site plan or “use district” considerations.4 For this reason, the enactment is characterized by a “lack of adherence to the fundamental rule that zoning deals basically with land use and not with the person who owns or occupies it.” (Matter of Dexter v Town Bd., 36 NY2d 102, 105 [1975].) Use district creation, and the regulation of uses, “must be reasonable and relate only to the real estate involved without regard to the person who owns or occupies it.” (Supra; see also, FGL & L Prop. Corp. v City of Rye, 66 NY2d 111, 116 [1985] [“the cases are legion, in this State and elsewhere, which hold that ‘zoning * * * in the very nature of things has reference to land rather than to owner’ ”], quoting Vernon Park Realty v City of Mt. Vernon, 307 NY 493, 500 [1954].) This principle applies with equal force when it is the town itself or a fire district which owns the land in question. That this local law is intended to regulate according to ownership is evident from an examination of the categories of priority alone, and is made even more manifest by the predecessor *745 than the Town of Rush” and “property of not for profit organizations”, the two categories removed by Local Law No. 2.
*744 -punoq ¡Bdioranui ajiqia aq) asuduioo iqSiui uoqsanb ui uoiSaj oiqdBjgoaS aq) qgnoq) uaAa ‘ja^oBJBqo ui jbuot^booj jo jbo -iqdBjfioaS si q q asodxnd oqaqqae aqq. saAjas puB asnas saquín uoiqqngax qons ‘¿^saquen C[886I idaQ pg] ‘g8g
*745 If the purpose of Local Law No. 2 is to restrict unsightly towers from a portion of the Town which harbors a certain aesthetic preference, restriction from residential districts except as a last resort, and from other commercial or other industrial districts except when Town or fire district property is unavailable, constitutes a regulation according to simple ownership,' a criterion which has not been demonstrated to achieve the asserted aesthetic purpose. (Russell v Town of Pittsford, 94 AD2d 410, 413-414 [4th Dept 1983] [requiring “some rational explanation by the town to rebut the claim that the ordinance is unduly restrictive and to demonstrate the required nexus between this ordinance and the town’s stated objective”].) “[Regulation in the name of aesthetics must bear substantially on the economic, social and cultural patterns of the community or district.” (People v Goodman, 31 NY2d 262, 266 [1972], cited in Philanz Oldsmobile v Keating, 51 AD2d 437, 441 [4th Dept 1976], supra.) Under the Local Law, Town property in residential districts has priority over private property in industrial and commercial districts. Similarly, Town property in a residential district has priority over private property in the same residential district.
The problem is not merely abstracted from an examination of Local Law No. 2 itself. Section 99-7 (A) (2) of the Rush Town Code plainly reveals that Town property is located within residential districts. Indeed, it appears that all Town property is located within residential districts because there is no similar provision for uses associated with governmental functions in the sections governing commercial or industrial districts. (See, Rush Town Code § 99-12 [A]; § 99-13 [A]; § 99-14 [A].) Why a telecommunications tower on Town property in a district zoned residential, industrial or commercial achieves the desired aesthetic, or a region’s “artistic conformity”, more than a tower on private property in such districts eludes rational explanation. The regulation might preserve telecommunications rents to the Town or fire district, but such a purpose of expropriation, if there was one (and the Town does not claim one), is wholly unrelated to aesthetics.
The case might be different, at least for due process purposes if not for equal protection purposes, if the Local Law simply gave preference to existing tower sites. Such, a criterion arguably serves the prevailing aesthetic of the entire Town. But the record does not disclose, and the court’s own examination of *746 the Rush Town Code does not immediately reveal, where such towers are, whether on public or private property and in whát use district. Apart from Local Law No. 2, the zoning code permits “public utility or communication installations” in residential districts (Rush Town Code § 99-7 [B] [5]; § 99-8 [A]; § 99-9 [B] [2]; § 99-10 [A] [1]), commercial districts (Rush Town Code § 99-12 [B] [2]), and industrial districts. (Rush Town Code § 99-13 [A] [1] [d].) Accordingly, limitation of telecommunication equipment to existing tower structures would indeed suffer, for all this record shows, from the same constitutional infirmity of reserving such uses for particular landowners to the exclusion of others. But it is unnecessary to reach this question here, because Local Law No. 2 does not stop at that point, and it would be inappropriate in these circumstances to attempt a rewrite of the Local Law in accord with, excepting the proffered aesthetic rationale, largely undiscernible legislative interests. (Cf., People v Liberta, 64 NY2d 152, 171-172 [1984]; see, McKinney’s Cons Laws of NY, Book 1, Statutes § 150 [dj, at 328 [“where the valid and invalid portions are so interwoven that neither can stand alone (to achieve the legislative purpose deducible from the entire act), the entire act is void”].) The separability provision in Rush Town Code § 99-4 would not save any portion of Local Law No. 2.
Respondents’ reliance on Modjeska Sign Studios v Berle (43 NY2d 468 [1977]) is misplaced. In that case, the Court of Appeals upheld a law that, for aesthetic purposes, prohibited advertising in the Catskill and Adirondack Parks except on property within an incorporated village. The law was found to constitute a valid exercise of the State’s police power. But the law in Berle did not give preference to any category of property ownership in general, or to public property in particular, as does Local Law No. 2. Berle would be analogous if the advertisers in that case who sought to erect signs or billboards in the parks were required by the regulation to give priority to locations on public property. The Court in Berle was not confronted with such a regulation. For the reasons stated above, such a law cannot be upheld. A legislative preference granted to government-owned property raises expropriation concerns quite unrelated to aesthetics, and it does not even serve the aesthetic goal unless the Town shows that the government property granted such a preference lies within a particular district of the Town serving an aesthetic interest consistent with the use proposed. No such showing has been made by the Town of Rush in this case.
*747 In sum, Local Law No. 2 is unconstitutional because there is no reasonable nexus between its objective, to protect the aesthetic character of the Town, and the means employed to implement that objective, i.e., having the Planning Board give preferential treatment to property owners having existing towers, and property owned by the Town and the Fire Department. (Russell v Town of Pittsford, 94 AD2d, supra, at 413-414.) The Local Law is, therefore, an invalid and arbitrary exercise of the Town’s zoning power.
Equal Protection Claim
Petitioner also contends that Local Law No. 2 deprives him of equal protection of law, as guaranteed by the State and Federal Constitutions. To establish an equal protection claim, petitioner must prove that his “(1) property [is] similarly situated; (2) [to those who] received different treatment from the [Town]; and (3) [there is] no rational basis account[ing] for the differential treatment.” (Del Monte Dunes at Monterey v City of Monterey, 95 F3d 1422, 1426 [9th Cir 1996], reh denied 127 F3d 1149 [9th Cir 1997].) A town “denies equal protection when it treats persons similarly situated differently under the law [citation omitted], and this difference may be created by the grant of a preference as well as by the imposition of a burden”. (Matter of Abrams v Bronstein, 33 NY2d 488, 492 [1974].) For the reasons stated above, preference according to ownership has been enacted. I turn again to rational basis.
“[T]he traditional test for a denial of equal protection under State law is ‘whether the challenged classification rests on grounds wholly irrelevant to the achievement of a valid state objective.’ ” (Matter of Abrams v Bronstein, 33 NY2d, supra, at 492, quoting Turner v Fouche, 396 US 346, 362 [1970].) “To apply this test we must, as an initial step, ascertain both the basis of the classification involved and the governmental objective purportedly advanced by the classification.” (Matter of Abrams v Bronstein, supra, 33 NY2d, at 492.) “The classification must then be compared to the objective to determine whether the classification rests ‘upon some ground of difference having a fair and substantial relation’ to the object for which it is proposed.” (Supra, 33 NY2d, at 492-493, quoting Reed v Reed, 404 US 71, 76 [1971].) “The rational basis standard [thus] has two prongs: (1) the challenged action must have a legitimate purpose and (2) it must have been reasonable for the legislators to believe that the challenged classification would have a fair and substantial relationship to that purpose”. (A6- *748 berbock v County of Nassau, 213 AD2d 691 [2d Dept 1995], citing New York City Managerial Empls. Assn. v Dinkins, 807 F Supp 958, 965 [SD NY 1992].) New York’s Equal Protection Clause is construed in pari materia with its Federal analog. (Under 21, Catholic Home Bur. for Dependent Children v City of New York, 65 NY2d 344, 360, n 6 [1985].) Because no suspect classification is alleged here, the Town’s enactment is “entitled to a presumption of rationality ‘that can only be overcome by a clear showing of arbitrariness and irrationality’ ”. (Abberbock v County of Nassau, 213 AD2d, at 691, quoting Hodel v Indiana, 452 US 314, 332 [1981].)
Petitioner contends that private landowners are treated differently than other classifications of landowners under Local Law No. 2, and that such disparate treatment serves no legitimate State interest. He concedes the traditional zoning powers of the Town, but claims that Local Law No. 2 is not a traditional exercise of such power. In particular, he contends that the boundaries drawn by the Local Law classifications are, at least in part (i.e., the part related to him), unrelated to conventional zoning law classifications or boundaries. Conceding that the Town might have a legitimate governmental or zoning purpose to corral or confine radio tower location to areas that do not offend the aesthetic and other criteria contained in section 99-29A of the Rush Town Code, petitioner contends that there is no evidence that the discrimination among landowners, particularly public and private landowners, advances that purpose. Petitioner thus posits that the Local Law permits erection of towers on public property, and that such public property locations may generally offend the aesthetic and other considerations underpinning the Town’s comprehensive plan.
For the reasons discussed above with respect to the takings claim, the court agrees with petitioner that Local Law No. 2 lacks a rational basis. The court rejects respondents’ contention that the equal protection claim must be dismissed because petitioner is treated similarly to other owners of property in residential districts. Petitioner’s property is, in fact, treated differently than other property in residential districts, i.e., property owned by the Town and the Fire Department. Because respondents have not demonstrated a rational basis for such disparate treatment, Local Law No. 2 must be declared unconstitutional on equal protection grounds.
*749 PROVISIONS OF TELECOMMUNICATIONS ACT OF 1996
Although no party has argued the point, nothing in the Telecommunications Act (TCA) would alter this analysis. Section 704 (a) of the TCA (Pub L 104-104), entitled the “[n]ational * * * [s]iting [p]olicy,” specifically reserves to the Town of Rush its general zoning authority “over decisions regarding the placement, construction, and modification of personal wireless service facilities.” (47 USC § 332 [c] [7] [A]; see, AT&T Wireless Servs. v Orange County, 982 F Supp 856, 861 [MD Fla 1997] [“appropriate deference to the traditional decision making prerogatives of local governments”].) The TCA only limits the Town’s regulation in this area by prohibiting (1) regulations which “unreasonably discriminate among providers” (47 USC § 332 [c] [7] [B] [i] [I]), (2) regulations which “have the effect of prohibiting” installation of towers (47 USC § 332 [c] [7] [B] [i] [II]), (3) conduct by the town unreasonably delaying action on permit requests, (4) denials of permit requests not made in “writing and supported by substantial evidence contained in a written record” (47 USC § 332 [c] [7] [B] [iii]), and (5) regulations based on “the environmental effects of radio frequency emissions” not otherwise prohibited by law. (47 USC § 332 [c] [7] [B] [iv].) “Accordingly, [while] local zoning measures are permissible only to the extent they do not interfere with the TCA” (Sprint Spectrum v Town of Easton, 982 F Supp 47, 50 [D Mass 1997]), none of these provisions of the TCA are invoked in this case. This case arises out of concerns essentially local in character.
Nor does the provision in the TCA which directs the Federal Communications Commission to “provide technical support to [the] States to encourage them to make property, rights-of-way, and easements under their jurisdiction available for” providers grant any franchise or other preference to the Town obviating its need to comply with the three provisions of the Constitution found violated here. (Pub L 104-104, tit VII, § 704 [c], 110 US Stat 152 [Feb. 8, 1996].) A congressional provision which directs a Federal agency to encourage State and local governments to make their property “available” for TCA purposes does not confer upon a local government the power to enact unconstitutional regulations conferring upon it a virtually exclusive franchise, or otherwise granting it a preference in derogation of the Takings Clause, the Due Process Clause, the Equal Protection Clause of the Constitution, and the *750 uniformity requirement described above. In other words, the TCA does not supply another and unpleaded justification (or legitimate governmental purpose) for the priority hierarchy contained in Local Law No. 2.
CONCLUSION
Local Laws No. 1 and No. 2 were enacted in accordance with lawful procedure and respondents gave proper legal notice of all public hearings and meetings of the Town Board. Local Law No. 2 nevertheless constitutes an unconstitutional exercise of the Town’s zoning powers and deprives petitioner of his rights to equal protection under the law. The petition is granted to the extent that a declaratory judgment may be entered consistent herewith.
[Portions of opinion omitted for purposes of publication.]

. To be distinguished is the context of a new enforcement of a preexisting restriction. (Kim v City of New York, 90 NY2d 1, 14 [1997]; Matter of Gazza v New York State Dept. of Envtl. Conservation, 89 NY2d 603, 615-616 [1997], supra; Matter of Anello v Zoning Bd. of Appeals, 89 NY2d 535, 540 [1997].)

. On this issue, see Pittman v Chicago Bd. of Educ. (64 F3d 1098, 1104 [7th Cir 1995] [observing that the Supreme Court left the issue open in Connolly v Pension Benefit Guar. Corp. (475 US 211, 224 [1986]), but that the issue is foreclosed to “property” holders in the Seventh Circuit and that “(t)here is historical warrant for the narrow reading of ‘property” ” applicable in that jurisdiction]; contra, 767 Third Ave. Assocs. v United States, 48 F3d 1575, 1578, n 2 [Fed Cir 1995]).

. Recently Epstein has been described as the “harshest critic[ ] of governmental regulation” in the takings context. (McKenzie v City of Chicago, 118 F3d 552, 557-558 [7th Cir 1997] [Easterbrook, J.].)